UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| CARMEN MARLYN SOLANO VILCHIS, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | 13 C 1934 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| ANTHONEY WAYNE HALL, | ) | |
| | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION AND ORDER

Petitioner Carmen Marlyn Solano Vilchis and Respondent Anthoney Wayne Hall are the parents of two daughters aged five and seven. Solano currently lives in Tijuana, Baja California, Mexico, which is just across the border from the United States, and Hall currently lives in Waukegan, Illinois. In late August 2012, after a period of about twenty months during which the children were spending time with both Solano in Tijuana and Hall in San Diego, California, Hall took the children to Illinois. Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), Solano filed with the Mexican Central Authority a request for the return of the children to Mexico. The Mexican Central Authority forwarded Solano's request to the United States Central Authority. Solano then filed a counseled Hague Convention petition in this court. Doc. 1. Hall appeared, Doc. 10, and the court recruited counsel to represent him, Doc. 13.

A court held a two-day evidentiary hearing, with Solano testifying via videoconference from Mexico. Docs. 29-30; Trial Transcript ("Tr.") 1-196 (reproduced at Docs. 41-2, 41-3, 41-4, and Doc. 41-5 at 1-22). At the conclusion of the hearing, the parties agreed upon a post-hearing briefing schedule. Doc. 30. The briefs focus on two issues. Docs. 35-37, 41-42. The first is

1

whether Solano has proved by a preponderance of the evidence that Hall wrongfully removed the children from Mexico, or wrongfully retained them in the United States, within the meaning of Article 3 of the Convention. *See Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013); *Kijowska v. Haines*, 463 F.3d 583, 586 (7th Cir. 2006); *Koch v. Koch*, 450 F.3d 703, 715 (7th Cir. 2006). The second issue, which becomes relevant only if there has been a wrongful retention or removal, concerns Article 13(a) of the Convention, which provides that the children need not be returned to Mexico if Hall has proved that Solano "consented to … the removal or retention." Convention, art. 13(b); *see Walker v. Walker*, 701 F.3d 1110, 1122-23 (7th Cir. 2012).

Having considered the evidence (including the depositions of four non-party witnesses who did not appear at the hearing) and the parties' legal arguments, the court finds that Solano has not proved by a preponderance of the evidence that Hall wrongfully removed or retained the children. Accordingly, the court denies Solano's petition.

**Findings of Fact**

The court finds the following facts by a preponderance of the evidence.

1.Solano was born in Mexico and is a citizen of Mexico. In 1999, when she was thirteen years old, Solano moved to the United States with her family and settled in Illinois. Tr. 67-68; Doc. 36 at 11. She resided in the United States as an undocumented immigrant until moving back to Mexico in October 2010 due to a family emergency discussed in greater detail below. Tr. 68, 76. Solano speaks English fluently. Tr. 68-69.

2.Hall was born in Waukegan, Illinois, and is a United States citizen. Tr. 88.

3.Solano and Hall met in 2005 in Illinois and moved in together shortly after beginning a romantic relationship. Tr. 55-56, 92-93; Doc. 37 at 22-26.

4. Solano gave birth to their first daughter in May 2007 and their second daughter in November 2008. Pet. Tr. Exhs. 2-3 (Doc. 41-6 at 2; Doc. 41-7 at 2-3); Tr. 89-90. The children are United States citizens. Tr. 69. The couple lived together sporadically in the Chicago area until October 2010. Tr. 56-58, 93; Doc. 37 at 55-56.

5. In October 2010, Solano told Hall that she and her family had to leave Illinois immediately, within a day or two, due to threats made against Solano's sister by the sister's husband, a man named Juan Hacha. Tr. 59, 76-77, 93-96; Doc. 36-1 at 11-15, 27-31. The court expressly finds that Solano would not have wanted to leave Illinois but for that threat. Tr. 80 (where Solano agreed that she "had made no concrete plans of any kind before the family emergency to leave Illinois").

6. Hall did not want to leave Illinois and did not want the children to leave Illinois. Tr. 95-98.

7. Hall decided to leave Illinois with Solano so that he could remain with their children. Tr. 96. At first, Solano told Hall they were going to California. Tr. 94, 96. At some point during the trip, which the entire group took in Hall's truck and two other vehicles, Solano and her family told Hall that they in fact were going to Mexico. Tr. 77, 96-97, 99.

8. Solano testified that she spoke with Hall before the trip about going to Mexico and that he agreed it would be a good opportunity. Tr. 70-71, 80-81. The court finds that particular testimony to be not credible, as Hall persuasively testified that he never wanted to move himself and the children to Mexico. Tr. 95-98, 127.

9. At the time he agreed to leave Illinois, Hall did not intend for the children to establish residence in Mexico. Tr. 95-96.

3

10. Solano, her family, Hall, and the children arrived in Mexico in mid-October 2010. Tr. 99. They spent about two weeks in northern Baja California and then went to Mexico City. Tr. 100; Doc. 36 at 27-28.

11. In late November 2010, Hall went to the United States Embassy in Mexico City to ask for help in getting the children back to the United States. Resp. Tr. Exh. 1 (Doc. 41-5 at 24); Tr. 101-104. The State Department closed the file in February 2011 when Hall reported that the children had returned to the United States. Doc. 31 at 7.

12. After a brief stay in Mexico City, Solano and the children moved to the Tijuana area, directly across the border from the United States. Doc. 35 at 4; Tr. 59.

13. Hall returned to Illinois in December 2010 and stayed there for several weeks. Tr. 100, 104-105. In February 2011, Hall returned to the San Diego area, directly across the border from Mexico. Tr. 105.

14. During the next several months, Hall looked for work in the United States and crossed the border every day to see Solano and the children. Tr. 105-106.

15. Also during that time, Solano wanted to cross the border from Mexico to the United States to live in the United States. Tr. 105-106. Hall visited lawyers in an effort to help Solano achieve that goal legally, but those efforts were unsuccessful, and Solano did not attempt to cross the border illegally because her siblings had tried to do so and had been caught and sent back to Mexico. Tr. 106-107, 165-166.

16. Solano testified at the hearing that she attempted to change her immigration status so that she could try to return to the United States. Tr. 81-82.

17. During Summer 2011, with Solano's consent and financial support, Hall took the children for a trip to the Chicago area. Tr. 60, 107-108. While in the Chicago area, Hall

4

obtained TB tests for the children. Resp. Tr. Exhs. 2-3 (Doc. 41-5 at 25-26); Tr. 108-110. The purpose of obtaining the TB tests was to satisfy one of the requirements of YMCA Cortez Hill, a homeless shelter for families in the San Diego area. Resp. Tr. Exh. 4 (Doc. 41-5 at 27-28); Tr. 110-114.

18. In Summer 2011, Hall returned with the children to California, and then brought the children to Mexico to see Solano. Tr. 110. Solano told Hill that Hacha, her sister's husband, was back in the picture and in the area, which greatly concerned Hill given his belief that Hacha was dangerous and possibly in a gang or cartel. Tr. 111, 147-148, 157.

19. From mid-September 2011 through mid-October 2011, Hill and the children stayed at the Dreams for Change Safe Parking Program, essentially a parking lot in the San Diego area with amenities where homeless persons may spend the night in their cars. Pet. Tr. Exh. 3; Tr. 61-63, 149, 162, 170-171, 174-175. From mid-October 2011 through late December 2011, Hill stayed at the YMCA Cortez Hill shelter with the children. Pl. Tr. Exh. 3; Tr. 114-115, 151-152, 173-174. During that time, Hill brought the children to Tijuana to see Solano on some weekends; the visits to Mexico became more frequent when Hill heard that Solano's sister and Hacha were not around. Tr. 115. Also during that time, the children were enrolled in Wee Care, a daycare center in Chula Vista, a town between San Diego and the Mexican border; they also received medical care through CalWorks, a state medical program in California, and other benefits through the California Women Infants and Children program. Resp. Tr. Exh. 5 (Doc. 41-5 at 29-30); Tr. 115-120.

20. On September 9, 2011, Solano sent an email to Hall stating, in part: "I want the kids to go to school in California defenetely [sic] not in Mexico not at all." Resp. Tr. Exh. 7 (Doc. 41-5 at 32); Tr. 123-126.

5

21. In October 2011, Hall sent Solano an email stating: "I will bring them to visit you, i' can't really say when because we are in a program. We found a school the girls liked and they start soon [so] they need the[ir] blankets and pillows. And shoes we go to the park for hours the[ir] shoes wear out fast." Resp. Tr. Exh. 6 (Doc. 41-5 at 31); Tr. 120-122. This email provides confirmation that the children largely stayed with Hall in Fall 2011 and attended school in the United States.

22. Hall brought the children to Mexico for Christmas break in December 2011. Tr. 122-123. Solano initially did not allow Hall to bring the children back to the United States because she was upset that they had been living at the Dreams for Change lot and the YMCA facility. Tr. 123, 126, 160, 189. But Solano ultimately relented, and the girls traveled back and forth from the United States to Mexico, spending nights in both places, from January 2010 through May 2012. Tr. 126-127, 160-161, 167-168; Doc. 36-1 at 36-37; Doc. 36-2 at 18-19.

23. In April 2012, Hall signed a month-to-month rental agreement for an apartment in Chula Vista; the agreement listed the occupants as Hall and the children. Resp. Tr. Exh. 8 (Doc. 41-5 at 33-46); Tr. 128-129. Each child had a bed and toys in the apartment. Tr. 46, 132.

24. In May 2012, the children began attending Miss Evelyn's Daycare in Chula Vista, and the older child soon began to attend kindergarten at Julian Rice Elementary School in Chula Vista. Tr. 134. From that point through July 2012, the children regularly spent the night with Hall on the United States side of the border. Tr. 132-134.

25. Hall's mother, father, and sister testified at the hearing that they visited Hall during Summer 2012 for about two weeks and that the children stayed with Hall every night. Tr. 36-38, 45-46, 133, 181-182, 185-186. Their testimony on this point was credible.

26. Solano denied at one point during the hearing that the children had spent any evenings with Hill in the United States between January 2012 and May 2012. Tr. 189-192. Based on the parties' manner while testifying and Solano's inability to recall details, Tr. 191-192, and Solano's contrary testimony at another point during the hearing, Tr. 78, the court finds that Solano's denial is not credible and that Hall's contrary testimony on this subject is credible.

27. Solano testified at the hearing that she "release[d] the kids back to" Hall in "around June 2012." Tr. 189. Solano testified that she did this because Hall told her that he had "a good job" and "an apartment," and she further testified that she and Hall came "to an agreement where the kids will go to school so that they continue to learn their English and keep their language." Tr. 189; *see also* Tr. 64.

28. Solano similarly testified at her deposition that she did not want the children to go to school in Mexico and that she preferred that they attend school in California "to keep their English." Doc. 41-9 at 9. Solano's mother testified similarly at her deposition. Doc. 36 at 32.

29. In July 2012, Hall enrolled the children in Medi-Care Managed Care, a state healthcare program operated by California. Resp. Tr. Exh. 9 (Doc. 41-5 at 47-48); Tr. 130-132.

30. Hall was unable to pay the rent at the Chula Vista apartment and was evicted by order of a California court in early August 2012. Resp. Tr. Exh. 10 (Doc. 41-5 at 49-50); Tr. 135-137.

31. Shortly thereafter, Hall started making plans to return with the children to Illinois, where Hall had a substantial support network of family. Tr. 134-135, 137-138. Hall informed Solano, who said that "she was okay with it" and that she just wanted to see the children before they left. Tr. 138. Hall believed at the time that Solano would attempt to cross into the United States, legally or illegally, and meet up with Hall and the children in Illinois. Tr. 134-135.

32. Hall and the children left the San Diego/Tijuana area in late August 2012 and have lived in the environs of Waukegan, Illinois, ever since. Tr. 88, 138-139.

## Conclusions of Law

The United States adopted and ratified the Hague Convention when it enacted the International Child Abduction Remedies Act ("ICARA") in 1988. *See* Pub. L. No. 100–300, 102 Stat. 437 (codified as amended at 42 U.S.C. §§ 11601-11611). Mexico became a party to the Convention on October 1, 1991. U.S. Dep't of State, "U.S. Hague Convention Treaty Partners," http://travel.state.gov/content/childabduction/english/country/hague-party-countries.html (last visited June 20, 2014). This court has jurisdiction under the ICARA. *See* 42 U.S.C. § 1603(a). Courts must decide petitions brought under the ICARA "in accordance with the Convention." *See id*. § 11603(d).

Solano has the burden of establishing, by the preponderance of the evidence, that the children were wrongfully removed from Mexico or retained in the United States. *See id*. § 11603(e)(1)(A). Article 3 of the Convention provides:

> The removal or the retention of a child is to be considered wrongful where—
>
> a) it is in breach of rights of custody attributed to a person, an institution, or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention, art. 3. Article 5 provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a).

While recognizing that there are some differences between wrongful retention and wrongful removal, *see Redmond*, 724 F.3d at 738; *Walker*, 701 F.3d at 1118, the court does not decide whether this case involves an alleged wrongful retention or an alleged wrongful removal. As an initial matter, unlike the situation in most Hague Convention cases, the children moved fluidly and regularly (at times daily) between the two countries, United States and Mexico, with the consent of both parents. This makes it difficult to determine, and it would be something of a fiction to definitively say one way or the other, whether Hall removed the children from Mexico or retained them in the United States when he took them from the San Diego/Tijuana area to Illinois. In addition, and perhaps more importantly, the parties' briefs are agnostic as to whether this is a removal case or a retention case, and they recognize no distinction between the habitual residence analysis in retention versus removal cases. Doc. 34 at 9 (arguing that the "task of this Court" is to determine whether the "children were wrongfully removed from Mexico or wrongfully retained in the U.S."); *ibid*. ("Prior to removal or retention the two children were habitual residents of Mexico."); Doc. 41 at 7. The parties have therefore forfeited any argument that this case involves retention as opposed to removal (or vice versa) or that the habitual residence analysis differs in any material respect between those two scenarios.

The parties agree that Solano can prevail only if she shows that Mexico was the children's habitual residence in late August 2012, when the alleged wrongful removal/retention occurred. Doc. 35 at 9 (where Solano agrees that part of her "prima facie case" is showing that "[p]rior to removal or retention, the child was habitually resident in [Mexico]"); Doc. 41 at 7.

This agreement is consistent with governing precedent. *See Redmond*, 724 F.3d at 737 ("In practical terms, the convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State.") (internal quotation marks and emphases omitted); *Walker*, 701 F.3d at 1119 ("To prevail on his petition, Iain was required to show that Australia was the children's habitual residence at the time of their retention in the United States.").

"The determination of 'habitual residence' is to be made on the basis of the everyday meaning of these words rather than the legal meaning that a particular jurisdiction attaches to them …." *Kijowska*, 463 F.3d at 586. "The determination of habitual residence under the Hague Convention is a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case." *Redmond*, 724 F.3d at 732. "Determining a child's habitual residence … requires an assessment of the observable facts on the ground, not an inquiry into the child's or the parent's legal status in a particular place." *Ibid*.

The Seventh Circuit has loosely adopted the framework set forth in *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), for determining habitual residence. *See Redmond*, 724 F.3d at 743-46; *Koch*, 450 F.3d at 715. "In the case of young children, the [*Mozes*] court found it most prudent to focus on the intent of the parents rather than the intent of the child in determining the child's habitual residence." *Koch*, 450 F.3d at 713. The district court must "determine whether the parents intended to abandon their previous habitual residence, judging that intent at the last time the parents had a shared intent." *Id*. at 709. As the Seventh Circuit recently made clear, the district court also must consider, in addition to the parents' last shared intent, "the child's acclimatization" to one country or another. *Redmond*, 724 F.3d at 746.

It is undisputed that until Solano, Hall, and the children left Illinois in October 2010, the children's habitual residence was the United States. The question here is whether their habitual residence changed to Mexico at any point between October 2010 and late August 2012. The answer to that question plainly is "no". This is so for the following reasons.

First, Hall never intended that his children would reside indefinitely in Mexico. It is true that Hall allowed the children to leave Illinois in October 2010, and it also is true that he agreed during the trip to the West Coast that the children would go to Mexico. But the circumstances of the group's departure from Illinois were extenuating, prompted by threats from Hacha that were sufficiently dire and credible to compel the family to pick up and leave Illinois on such short notice. And it was always Hall's intention that the children would return with him to the United States, albeit in southern California rather than Illinois, so that the children (and possibly Hall) could remain close to Solano, who could not legally cross the border into the United States. These conclusions are proved by, among other things, the fact that Hall asked the United States Embassy in Mexico City in November 2010, shortly after the group's arrival in Mexico, for help in getting the children back to the United States; Hall's extraordinary efforts to have the children live with him in California, even if it meant living in a parking lot for homeless families or a YMCA shelter; Hall's seeking legal assistance in an effort to obtain legal status for Solano in the United States; and Hall's enrolling the children in daycare, school, and the state medical assistance program in California.

All this shows that Hall never intended for the children to relocate indefinitely from the United States to Mexico. This is significant because, as noted above, precedent requires the court "to determine whether the parents intended to abandon their previous habitual residence, judging that intent at the last time the parents had a *shared intent*." *Koch*, 450 F.3d at 709

(emphasis added).  Thus, even if Solano had intended for the children to reside indefinitely in Mexico, that intent was not shared with Hall, which means that their last shared intent was for the children to reside indefinitely in the United States, which in turn favors the conclusion that their habitual residence was the United States.  *See Redmond*, 724 F.3d at 744 ("The parents' last shared intent is one fact among others, and indeed may be a very important fact in some cases."); *Walker*, 701 F.3d at 1119-20 (focusing attention on the parents' last shared intent).

      Second, as it turns out, the evidence shows that Solano herself did not intend for the children to reside indefinitely in Mexico.  This is proved by, among other things, Solano's testimony that she has made efforts to obtain legal immigration status in the United States in order to return there; Solano's September 2011 email to Hall stating, "I want the kids to go to school in California defenetely [sic] not in Mexico not at all"; Solano's admission that she "release[d] the kids back to" Hall in "around June 2012" upon learning that he had "a good job" and "an apartment"; her further admission that she and Hall came "to an agreement where the kids will go to school so that they continue to learn their English and keep their language"; and Solano's deposition testimony that she did not want the children to go to school in Mexico and that she preferred that they attend school in California "to keep their English."  Solano's efforts to obtain legal status in the United States reflect a desire to return to the United States to be with the children and possibly Hall.  *See Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011) ("Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say.").  Solano's strong desire for the children to attend school in the United States and not Mexico, and for the children to keep their English skills, reflects an intent that her children make the United States their home; after all, if she wanted the children to live in and become acclimated to

Mexico, then it would have been important for them to attend school in Mexico. *See Fabri v Pritikin-Fabri*, 221 F. Supp. 2d 859, 869-70 (N.D. Ill. 2001) (holding that the child's "annual month-long visits with her mother's family [in the United States] do not alter that conclusion" that the child's habitual residence was Italy, where she attended school). And the fact that Solano agreed to "release" the children to Hall once she was assured that Hall had a job and an apartment shows that her intent was not that the children reside indefinitely in Mexico, but that the children stay in Mexico until Hall had an acceptable place for them to live in the United States.

Third, because "the parents' last shared intent" is not "a kind of fixed doctrinal test for determining a child's habitual residence," *Redmond*, 724 F.3d at 732, the court must also consider the children's "acclimatization" to the United States and Mexico, respectively, *id.* at 746. The children moved fluidly across the border and spent nights with Solano in Mexico and Hall in the United States, so their actual location during the relevant time frame is a wash. Most significant in terms of acclimatization is that the children were enrolled in daycare and school and received healthcare services in the United States. *See id.* at 743 (holding that the child's habitual residence was Illinois because, in part, the child "received regular care from an Illinois pediatrician and an Illinois dentist" and "went to daycare [and] pre-school" in Illinois). Attending school in the United States engages a child with, and prepares a child for, life in the United States, just as attending school in Mexico engages a child with, and prepares a child for, life in Mexico. It cannot be said that the children acclimated to Mexico while attending daycare and school in the United States, even granting that Solano's family resided largely if not exclusively in Mexico. *See id.* at 744 ("Although [the father] and his extended family live in Ireland, these ties, without more, do not translate to habitual residence."). And while the analysis

13

could stop there, it bears mention that Solano's acknowledged goal of obtaining legal status in the United States reflects her desire to come back to the United States and thus her understanding that the children would remain acclimated in and make their home there.

Accordingly, Solano has not proved that the children's habitual residence in late August 2012 was Mexico, and therefore she has not proved that Hall's removal of the children from Mexico or retention of the children in the United States was wrongful within the meaning of Article 3 of the Convention. *See Kijowska*, 463 F.3d at 588; *Feder v. Evans-Feder*, 63 F.3d 217, 222-26 (3d Cir. 1995). Given this conclusion, there is no need to determine whether Solano consented to the retention or removal within the meaning of Article 13(a). *See Redmond*, 724 F.3d at 742 ("If a child has not been moved from its habitual residence, … relief under the Hague Convention must be denied without further inquiry ….").

## Conclusion

For the foregoing reasons, Solano's petition is denied. The court's ruling does not speak, one way or the other, to either party's fitness as a custodial parent. If Solano wishes to seek custody of the children, she can and should pursue relief in the courts of the United States. *See Abbott v. Abbott*, 130 S. Ct. 1983, 1989 (2010) ("A return remedy … leaves custodial decisions to the courts of the country of habitual residence."); *Redmond*, 724 F.3d at 737 ("The merits of the child custody case—where a parent's custody and visitation rights should be—are questions that are reserved for the courts of the habitual residence.") (internal quotation marks omitted); *Koch*, 450 F.3d at 711 (same). Whether the appropriate venue for a custody determination is California or Illinois is a matter for the state court(s).

July 2, 2014

_____
United States District Judge